30 C.C.P.A. (Patents)

### TAYLOR v. SWINGLE.
### Patent Appeal No. 4721.

Court of Customs and Patent Appeals.
June 10, 1943.

Robert Cushman and T. T. Greenwood, both of Boston, Mass. (Roberts, Cushman & Woodberry, of Boston, Mass., of counsel), for appellant.

O. H. Eschholz, F. W. Lyle, and Ralph H. Swingle, all of East Pittsburgh, Pa., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office, awarding priority to the party Swingle upon two counts involved in an interference proceeding, which read as follows:

"1. In an electric switch, a movable contact member, two opposed displaced fulcrums, an actuator for said contact member disposed between said fulcrums and normally bearing and fulcruming on one fulcrum, and means for withdrawing said one fulcrum to effect the fulcruming of the actuator on the other fulcrum.

"2. In an electric switch, two opposed displaced fulcrums, an actuator between said fulcrums, spring means exerting pressure on said actuator on the same side of both fulcrums arranged to press said actuator in one direction against one fulcrum and in the opposite direction against the other fulcrum, a contact member operated by said actuator, and means for withdrawing one fulcrum from operative relation with the actuator to effect the turning of the, actuator about the other fulcrum."

The counts were copied from a patent, No. 2,160,236, issued to the party Taylor May 30, 1939, upon an application filed March 24, 1937. The application of Swingle into which were copied the patent claims was filed April 14, 1934. The claims appear to have been introduced into Swingle's application June 8, 1940, and the interference was declared by the examiner July 9, 1940.

It appears that Taylor's patent stands assigned to the Chase-Shawmut Company, a corporation of the State of Massachusetts, and Swingle's application stands assigned to the Westinghouse Electric & Manufacturing Company, a corporation of the State of Pennsylvania.

The opening paragraph of the board's decision reads: "The subject matter in issue relates to an electric switch having circuit breaker means therein whereby under normal operation the switch may be opened and closed by an operating handle and whereby under abnormal conditions, a thermal element is actuated for opening the circuit automatically.

Taylor being the junior party, it was incumbent upon him to prove his case by a preponderance of the evidence, and testimony was taken in his behalf. Certain testimony was also taken on behalf of Swingle but no effort was made to prove dates of invention on his part prior to the filing date of his application, April 14, 1934, and he is restricted to that date for conception and reduction to practice.

No question was raised as to the right of either party to make the counts and the primary issue before us relates to the matter of Taylor's alleged reduction to practice.

The board awarded Taylor conception of the invention as of June 9, 1932, basing its holding upon a device introduced in evidence as Exhibit 1, which Taylor had made and which was subjected to certain tests on or about that date. No issue is made with respect to Taylor's conception on that date. The board held, however, that the tests then made did not constitute reduction to practice; that Taylor was lacking in diligence during the critical period, and, in effect, that the device, Exhibit 1, was an abandoned experiment.

It is contended on behalf of Taylor that the tests made in June, 1932, constituted reduction to practice and, therefore, that no question of diligence or of abandoned experiment is involved.

Swingle (appearing pro se) contends, as he contended below, that the tests referred to did not constitute reduction to practice but argues that if the court should hold otherwise then Taylor is estopped under the doctrine of Mason v. Hepburn, 13 App. D.C. 86, 1898 C.D. 510.

Obviously, the first question to be determined is that relating to Taylor's reduction to practice. In its findings of fact the board said, inter alia (page references omitted):

"From the record submitted on behalf of Taylor it appears that prior to January, 1938, when Taylor entered the employment of The Chase-Shawmut Company, he operated a general machine shop of which he was the owner and at various times did work for the Chase-Shawmut Company. In 1930 The Chase-Shawmut Company became interested in developing a circuit breaker which would be cheap and could be used in place of fuses normally used in household circuits. To this end The Chase-Shawmut Company commissioned Taylor to develop such a device. Taylor testified that he worked on such switches in 1930 but the first switch which purportedly supports the counts in issue was not developed until 1932 and that appears as physical Exhibit 1 herein. After this switch was completed by Taylor at his machine shop it was taken to The Chase-Shawmut Company and there tested by Taylor and Wood, works manager of The Chase-Shawmut Company. The tests were purportedly completed on June 9, 1932 and the date of their completion was marked on the exhibit both in pencil on the wood block and by scratching the date on the brass actuator member. Wood sufficiently corroborates the existence of this device on that date and, accordingly, conception of the invention in issue has been established by Taylor as of this date.

"After these tests in 1932 the device was returned to Taylor and kept in his desk drawer and nothing further was done either in the way of tests or of further development until 1936 when similar devices appeared on the commercial market. Inasmuch as the senior party Swingle has a record date of April 14, 1934, the party Taylor must establish a reduction to practice based on the tests of the device of Exhibit 1 in 1932 in order to prevail.

"According to the testimony of Wood, the device was tested by placing it in a 115 volt lighting circuit in series with an ammeter, carbon pile resistor, cast iron grid resistor and line switch in accordance with the diagram of Exhibit 7. The current through the circuit breaker was varied by varying the amount of resistance of the cast iron grid and carbon pile resistors and the current noted on the ammeter to determine if the circuit breaker tripped at the proper current. On the first tests it was found that the breaker would not trip at the proper current and, accordingly, the bimetallic strip on Exhibit 1 was filed to increase its resistance. The circuit breaker was then found to trip at the proper current and the device was operated both as an electrical switch and a circuit breaker perhaps thirty or forty times * * *. Wood states that the only purpose of this test was to calibrate the breaker and that no attempt was made to determine the maximum interrupting ability of the device * * *."

Taylor does not appear to challenge the accuracy of the board's description of the physical structure embodied in Exhibit 1, nor the accuracy of its findings as to the tests to which the exhibit was actually subjected. In his brief, however, he states: "The first error into which the Board slips is in stating that Taylor set out to develop a circuit breaker to 'be used *in place* of fuses normally used in household circuits' * * *. The Taylor circuit breaker might under some circumstances be used 'in place' of a fuse, but it is certainly not necessarily limited to use as a substitute for fuses, nor even to use in a household circuit."

We have examined the testimony of Taylor and Wood (the only evidence there is) upon this point. It is not very specific as to the exact matter which was in their minds when Taylor first began his work, but we fail to see wherein this is of any particular importance. The board did not state that Taylor set out to develop a circuit breaker whose use would be *limited* to use as a substitute for a fuse, nor did it state that a device made in conformity with Exhibit 1 would be so limited. We quote further from the board's decision (omitting page references) as follows:

"It appears that a device of this character has two uses. It may be used as a circuit breaker to replace fuses in which case it must be able to interrupt currents of excessive amperage, the Underwriters' requirement for a breaker of this type being that it must interrupt a short circuit

of 10,000 amperes * * *. Again, the device may be used as a motor overload switch in which case it would be required to interrupt a circuit carrying eight times fuse load current, approximately 150 to 200 amperes * * *. In the test carried on in 1932 no record of the maximum current was made and the witnesses do not appear to recall what that current was but Wood states * * * that he believes that a test current of 40 to 50 amperes was used. In the device as tested, a short circuit was never applied directly across the circuit breaker such as might occur under normal conditions of use but the current was always applied through a load consisting of the cast iron grids and carbon pile which of necessity limited the amount of current in the circuit and consequently the amount of current the breaker interrupted. We do not believe that such a test simulates the normal use of the device sufficiently to establish its practicability for its normal intended purpose. While it is not necessary for a reduction to practice to meet *Underwriter's* specifications, they are of interest to indicate the nature of the tests which would be necessary to establish the utility of the device beyond possibility or probability of failure.

"In any intended purpose for this type of breaker it would appear to be necessary that the device be capable of interrupting a current of at least several hundred amperes and the device was never tested at such a high current carrying capacity. It might well be that the device would trip sufficiently at a small overload current but would be entirely impractical and useless when called on to interrupt currents of high values as would occur in practice. Again, as contended by the party Swingle, the device might interrupt such large currents but be so deformed in so doing that its calibration would be useless and could not be further used in the circuit without dangerous consequences. Devices of this type are in their very nature emergency devices which must operate every time an overload is placed on the line whether that overload be a slight overload or a very great overload due to a dead short. A device which has not been established by tests to be operative both on small and large overloads and to operate again and again even after tremendous overloads have been impressed, has not been established to have utility."

In his reasons of appeal to this court Taylor alleges error with respect to certain conclusions of the board, particularly with respect to its holdings to the effect that in a breaker of the type represented by Exhibit 1, it should have been demonstrated that it was capable of interrupting a current of at least several hundred amperes. We deem it unnecessary to set out in detail the several reasons of appeal relating to this matter. The arguments concerning it as set forth in Taylor's brief have been carefully considered but they are not convincing. The question involved is a technical one and we should not feel justified in reversing the board's holding upon the basis of mere argument.

 The brief seems to argue that the board gave undue weight to the evidence respecting the Underwriters' requirement for breakers of the type involved. We do not think the board did so. The board expressly stated that it is not necessary for a reduction to practice to meet Underwriters' specifications but said that they are of interest to indicate the nature of the tests necessary to establish utility of the device "beyond possibility or probability of failure." The term "possibility" is, of course, a strong term and if the board had held that in order to constitute reduction to practice the tests should have demonstrated utility beyond the *possibility* of failure, we think it would have been in error, but it did not so hold. Its decision should be read as a whole and fairly construed. That the tests in order to constitute reduction to practice should have been such as to establish utility beyond *probability* of failure admits of no argument. We do not think the tests made did this. Furthermore, we are not convinced that either Taylor or Wood believed they did *at the time the tests were made*, whatever their subsequent belief may have been. This view of ours is based upon the facts and circumstances of record, which may be epitomized as follows: Taylor at the instance of Wood (possibly as early as 1930) began the work which culminated in Exhibit 1, tested, as has been described, in June 1932. Evidently they felt there was a need for, or that a demand could be created for, a successful circuit breaker of the type defined in the counts. So far as the record here discloses they were, in a sense, pioneers in that particular field of endeavor. Taylor made Exhibit 1 and it was tested. The exhibit was then placed in Taylor's desk where it remained without further attention to it or, so far as the record shows,

to the conception which it embodied, until 1936—a period of practically four years—when commercial devices of the type represented by it made by others began to appear on the market.

The explanation given in the record as to why, during those years, neither Taylor nor his assignee gave any attention to the matter is not satisfactory. To our minds the only reasonable conclusion to be drawn from the facts and circumstances is that the work done in 1932 constituted nothing more than an abandoned experiment.

Since, in our view, Taylor has failed to establish reduction to practice prior to Swingle's filing date, or diligence during the critical period, it is unnecessary to consider the matter of abandonment under the doctrine of the Mason v. Hepburn case, supra.

For the reasons indicated, the decision of the Board of Interference Examiners is affirmed.

Affirmed.