50 CCPA
**Application of William L. HARTOP, Jr., and Edward P. Brandes.**

**Patent Appeal No. 6741.**

United States Court of Customs and Patent Appeals.

Dec. 12, 1962.

Worley, C. J., and Jackson, J., dissented.

Robert L. Niblack (Edmund A. Godula, Chicago, Ill., Watson Leavenworth Kelton & Taggart, New York City, and Carroll F. Palmer, of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN and SMITH, Associate Judges, and Associate Judge JOSEPH R. JACKSON, Retired.

MARTIN, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of appealed claims 30–34, 38 and 39 of appellants' application, Serial No. 418,468, for a patent on a "Therapeutic Composition." Certain claims were withdrawn from consideration by the examiner "as not being readable on the elected species" and are not before us. No claim has been allowed.

Each of the claims recites a "stable" solution of a "thiobarbituric acid compound." Claims 30 and 31 are representative:

"30. A stable solution of a thiobarbituric acid compound having anesthetic or hypnotic properties comprising a water-free solution of a thiobarbituric acid compound selected from the group consisting of a therapeutically useful thiobarbituric acid and the water soluble salts thereof, dissolved in a [sic] an anhydrous alcoholic solvent consisting of a mixture of a parenterally acceptable water-miscible lower aliphatic monehydroxy alcohol and a parenterally acceptable water-miscible lower aliphatic polyhydroxy alcohol, said solvent having dissolved therein a soluble alcoholate of a parenterally acceptable lower aliphatic alcohol and an alkali metal in an amount providing an alkali metal concentration substantially in excess of that required to maintain the said thiobarbituric acid compound

dissolved in said solvent as an alkali metal salt.

"31. A stable concentrated solution of a thiobarbituric acid compound having anesthetic or hypnotic properties comprising a substantially water-free solution of a thiobarbituric acid compound selected from the group consisting of a therapeutically useful thiobarbituric acid and the water soluble salts thereof, dissolved in an anyhydrous alcoholic solvent consisting of a mixture of a parenterally acceptable water-miscible lower aliphatic monohydroxy alcohol and a parenterally acceptable water soluble lower aliphatic polyhydroxy alcohol, said solvent having dissolved therein a soluble alcoholate of a parenterally acceptable lower aliphatic alcohol and an alkali metal in an amount providing an excess of between about 5% and 30% by weight alkali metal above the weight of the alkali metal in an alkali metal salt of the said thiobarbituric acid compound dissolved in said solvent."

According to appellants' specification, thiobarbituric acid compounds and salts thereof are important as anesthetic and hypnotic agents, especially for inducing surgical anesthesia of relatively short duration. For the latter purpose, dilute aqueous solutions of water-soluble thiobarbiturate salts are injected parenterally. These aqueous solutions are unstable and must be prepared shortly before use by dissolving the dry salts in water. Appellants consider it uneconomical to use small, individual-dose ampoules of the dry salts and inconvenient to weight and otherwise handle solid materials when preparing these solutions.

Appellants have discovered that certain concentrated, alkaline, non-aqueous solutions of thiobarbiturate salts are relatively stable, have a suitable shelf life,[1] and, just before parenteral administration, can be easily and conveniently diluted with water to produce a clear solution with a therapeutically effective concentration of the thiobarbiturate but yet with a concentration of organic solvents and alkaline material sufficiently low for safe injection.

Appellants prefer to use as a solvent, a mixture of an aliphatic monohydroxy alcohol such as ethyl alcohol and an aliphatic polyhydroxy alcohol such as propylene glycol, both alcohols necessarily being parenterally acceptable and water-miscible. With regard to the alkaline material, the specification states:

" * * * Since it is necessary that the therapeutic aqueous dilutions of the thiobarbiturates have a pH of about 10 and preferably about 10.5 to avoid a precipitate forming on diluting with water, it is highly desirable to include in the thiobarbiturate concentrated organic solvent solution a parenterally acceptable alkaline reagent in an amount sufficient to provide the aqueous dilution thereof with a pH of about 10 and preferably 10.5. For example, sufficient alkali metal alkoxide is incorporated in the concentrated non-aqueous thiobarbiturate solution to provide an amount of an alkali metal between about 5 and 30% by weight in excess of the weight of the alkali metal contained in the alkali metal salt of the thiobarbiturate composition in solution to effectively prevent precipitation on dilution with water. * * * "

It is the concentrated, alkaline, water-free, organic solvent solution of the thiobarbituric acid compound which appellants claim as their invention.

Although the examiner's answer discusses three grounds for rejection of the appealed claims, the board reversed the examiner on two grounds and the claims now stand rejected solely on a ground relating to the utility of the claimed solutions. This rejection involves several intermingled issues each of which we discuss in detail infra. It may be helpful

[1]. No evidence of decomposition or decrease in potency in these solutions was observed after 13 months at 40°C, or after 24 hours at 100°C.

in understanding our disposition of this case to set forth at this point what appear to be the three main points of the Patent Office position in this case. These are: (1) that the specification at bar discloses that the claimed solutions, after appropriate dilution, are to be administered to humans, (2) that there is doubt of the "safety" of the claimed solutions when so used, and (3) that "safety" must be demonstrated by injecting the diluted solutions into humans. The proposition of law here involved is that if appellants' solutions are not "safe" for the alleged use, they lack the utility required by 35 U.S.C. § 101.

Before we discuss the several issues, we will set forth and comment on certain other portions of the record.

During the prosecution of the appealed application, appellants submitted an affidavit by Henry C. Spruth,[2] from which we quote the following significant excerpts:

"That under his supervision, solutions of thiobarbiturates prepared and held as specified in the several herein designated specific examples of the above-mentioned patent application were subjected to anesthetic efficiency tests, acute toxicity tests, and were studied to determine the effect of the said thiobarbituric solution of the above-identified application on the hemoglobin of the administered subjects;

"That the said anesthetic-effect tests were conducted in accordance with the standard procedure established for the biologic testing of Abbott's "Pentothal" thiobarbiturate compound and comprised injecting rabbits of 1.2–2.0 keg. body weight intravenously (25 mg./kg.) in t' marginal ear vein with standa therapeutic aqueous dilutions of test solution which contained 25 1 /g. Pentothal per cc. Induction, depth,

and duration of anesthesia were observed.

\* \* \* \* \* \*

"That the acute toxicity tests were conducted in accordance with the standard procedure used for the biologic testing of Abbott's "Pentothal" thiobarbiturate compound and comprised injecting mice of 18–25 grams body weight intravenously in a tail vein with aqueous dilutions of the test solutions diluted to contain 2.5 mg. Pentothal per cc. Injection time for each mouse was 4 to 5 seconds. The $LD_{50}$ was determined by conventional methods, i. e.: groups of mice were given graduated doses until the dose was found which would be lethal to 50% of the mice at that dose. This dose is the $LD_{50}$;

"That the results of the above tests on compositions prepared and held under the conditions set forth in the following designated specific examples of said U. S. Serial No. 418,468 are as follows:

\* \* \* \* \* \*

"That from nine of the subject rabbits which had been anesthetised with the composition of Example II of the said patent application Serial No. 418,468, the results of which are reported herein, 5 ml. of blood were withdrawn through a heart puncture after awakening from the last injection and the individual blood samples subjected to analysis.

"That the hemoglobin readings on analysis of the serum from the 5 ml. blood sample of each of the nine rabbits mentioned above were less than ½ gram per 100 ml. and that all samples tested were diluted to 0.2 cc. of blood serum in 5 cc. of N/10 HC1;

"That the above subject rabbits from which blood had been drawn by heart puncture were then placed in metabolism cages, overnight urine

2. Mr. Spruth has been Manager of Abbott Laboratories' Bioassay Laboratories since 1935, and his qualifications, particularly

with regard to the conclusions expressed in this affidavit, have not been questioned.

samples collected, and the urine samples subjected to urinalysis and hemoglobin determination, the results of which are reported herein in Tables A and B:

\* \* \* \* \* \*

"That it is affiant's conclusion, based on the above comparative data, that *there are no significant differences between the safety and therapeutic effectiveness of regular 'Pentothal' powder, reconstituted, and any of the compositions of the specific examples of the said U. S. patent application Serial No. 418,468* and that the said compositions are safe, effective, and reliable for producing the therapeutic effects set forth in the specification." [Emphasis ours.]

At this point, we will comment briefly on the nature of the "thiobarbituric acid compound" involved in this case. The specification states:

"The principal thiobarbituric acid compound used to illustrate the present invention has been the readily available thiobarbiturate compound, sodium ethyl-(1-methylbutyl)-thiobarbiturate, more generally known as 'Pentothal' sodium. It should be understood, however, that the herein disclosed invention is applicable to other barbituric acid compounds containing an atom or functional group which causes the barbituric acid compound to form a precipitate when admixed with water in the absence of a strongly alkaline reagent, such as most of the thiobarbituric acid compounds. \* \* \*"

Except for two of the anesthesia experiments, all of the data set forth in the

Spruth affidavit relate to the use of dilute aqueous solutions of sodium ethyl-(1-methylbutyl)-thiobarbiturate,[3] each prepared either by aqueous dilution of one of appellants' "stable solutions" or by dissolving "Regular 'Pentothal' powder" in water. The latter "powder" is apparently a commercial material known to be useful as an anesthetic and used by Spruth as a comparison or control substance in testing appellants' "stable solutions."

Subsequent to submitting the Spruth affidavit, appellants also submitted an affidavit of Ralph C. Cox which demonstrates that a 2.5% aqueous solution of "commercial Pentothal containing sodium carbonate"[4] has a pH of 10.65, and that two other solutions, each prepared by aqueous dilution of one of appellants' solutions, each containing after dilution 2.5% Pentothal sodium, one containing 10% and the other 30% excess sodium, have pH values of 11.3 and 11.7 respectively.[5]

Coming then to the various issues, first we address ourselves to the controversy concerning the scope of the utility allegations in appellants' specification. Although appellants urged during the Patent Office prosecution of this case and continue to urge before us that their specification "has never alleged human use of their competition" and that there is "no specific representation of usefulness in humans" in their specification, it is our opinion that one skilled in the art to which appellants' invention pertains would conclude on reading the specification that appellants intend the claimed solutions, after appropriate dilution, will be useful for injection into humans.

"A means of expressing the degree of acidity or basicity of a solution. Thus at normal temperature a neutral solution such as pure distilled water has a pH of about 7, a tenth-normal solution of hydrochloric acid (\* \* \*) has a pH near 1 and a normal solution of a strong alkali such as sodium hydroxide has a pH of nearly 14. \* \* \*."

3. The generic name of this substance appears to be thiopental sodium. "Pentothal" sodium is apparently the Abbott Laboratories trademark for the same substance.

4. The sodium carbonate was sufficient to provide 30% excess sodium.

5. According to Rose and Rose, "The Condensed Chemical Dictionary," 5th Ed. (1956), pH is defined as:

We find support for our position in the following paragraph which appears near the end of appellants' specification:

"It is evident that in addition to providing an improved highly stable solution of barbituric acid compounds, such as the thiobarbiturates, the present invention also makes it possible for those desiring to use only small amounts of a thiobarbiturate at any one time to purchase thiobarbiturate solutions in large vials from which the individual therapeutic dilutions can be readily prepared and thereby avoid purchasing small individual dose ampoules of the dry acid salt as was heretofore necessary. Thus, the small purchaser such as *the individual doctor* can now obtain the same economic advantages as was heretofore possible only for the *large institutional users*." [Emphasis ours.]

We think the references in this paragraph to "the individual doctor" and to "large institutional users" can be construed logically only to involve use of appellants' invention in human therapy.

We find further support for our position in two standard reference works, "The Merck Index of Chemicals and Drugs," 7th Ed., pages 1039–1040 (1960) and "The Dispensatory of the United States of America," 25th Ed., pages 1419–1423 (1955).[6] Both of these discuss the use and value of dilute aqueous solutions of thiopental sodium in human therapy. In this connection, it should be observed that thiopental sodium is the "principal thiobarbituric acid compound used to illustrate the present invention."[7] It would be expected that appellants' claimed solutions would be used in place of solid thiobarbituric acid compounds such as thiopental sodium to prepare dilute aqueous solutions for human therapy. Therefore, we hold that the disclosed utility of appellants' claimed invention relates to the treatment of humans.

We turn next to the doubt which the examiner expressed as to the safety of appellants' invention when used for human therapy. Several aspects of this question merit discussion. As shown by the Cox affidavit, supra, two of appellants' solutions diluted for injection into human or lower animal veins have higher pH values than that of a comparable solution prepared from "commercial Pentothal containing sodium carbonate." Although his position is not completely clear to us, it appears the examiner was of the opinion that these pH differences are sufficient that "clinical evidence of freedom from vascular damage at the site of injection is a proper requirement." We note, however, that the examiner has given no reason nor has he cited any authority for this position which seems to be involved somehow with his statements that the 2.5 percent aqueous solution of thiopental sodium previously used clinically has "a pH of about 10"[8] and that such a pH "is high enough to cause local thrombosis of the venous lining if the

---

6. The solicitor in his brief has asked this court to take judicial notice of these two reference works. We do this and will refer to them again hereinafter for other reasons.

7. See footnote 3.

8. The examiner noted the Cox affidavit value of pH 10.65 for a 2.5 percent solution prepared from "commercial Pentothal" containing 30 percent excess sodium as sodium carbonate, but stated in his answer that "conventional solutions of 'Pentothal Sodium' do not contain excess of the alkali" and that therefore "their pH is even lower" than the 10.65 value reported by Cox. We conclude, however, from a study of the record before us and the "Merck Index" and "Dispensatory" cited elsewhere in this opinion that the "Regular 'Pentothal' powder" used by Spruth as a control substance in his study of the comparative safety of appellants' solutions (see Spruth affidavit, quoted in part elsewhere in this opinion) also contains a substantial quantity of the alkaline material, sodium carbonate. Indeed, the "commercial Pentothal" used by Cox appears to be the same as the "Regular 'Pentothal' powder" used by Spruth. Hence it would appear that pH 10.65 rather than pH 10 would be a more realistic value for the comparison the examiner has made.

injection were made so rapidly that dilution with the flow of blood in the vessel and the buffering value of the blood itself did not immediately serve to reduce the pH before the endothelium was damaged by a too irritating contact." [9] Apparently the examiner has assumed that injection of a solution with a pH 11.3 or 11.7 is also likely or, perhaps more likely, to cause this type of vein damage and has *not* considered that one skilled in the art of parenteral injections would presumably use at least the previous degree of caution when making an injection so as to avoid vascular damage.[10]

So we have merely an opinion by the examiner that vascular damage at the injection site in human beings is *possible* when appellants' solutions are diluted and injected.

Next we consider the Spruth affidavit which was submitted by appellants early in the prosecution of this case. In his answer, after noting that the tests described in this affidavit are limited to laboratory animals, the examiner stated:

"Applicants stress the fact that the Examiner did not attack the sufficiency of the showing in the Spruth affidavit itself. This point lacks merit since more extensive tests in laboratory animals still would not have served to settle the question of possible damage by reason of its great alkalinity to the blood vessel at the injection site in human beings."

We observe that this statement of the examiner does not criticize the Spruth affidavit as a demonstration that appellants' solution is safe and effective when used to induce anesthesia in *rabbits*. Moreover, nowhere in the record before us has the examiner or the board questioned this aspect of the Spruth affidavit and, with the concurrence of the solicitor expressed at oral argument, we will assume that safety and effectiveness of appellants' invention in rabbits have been established.

The Patent Office has, however, asked for more than proof of safety and effectiveness in rabbits. This is apparent from the statement of the examiner we have quoted supra. Further, in a letter subsequent to his answer, the examiner stated:

"Applicants have not affirmatively demonstrated the safety in humans of the claimed highly alkaline solutions employed. Tests in animals will not reveal phlebitis or venous thrombosis produced by excessively alkaline materials excepting by autopsy; in humans, pain directs attention to associated symptoms such as inflammation or coolness of the extremity."

In its consideration of this case, the board interpreted the examiner's position as being based "on the ground that no clear and convincing proof has been adduced that the claimed composition is safe, effective and reliable for the therapeutic effects set forth in the application." The board affirmed the examiner's rejection on that ground. We think that the following statement from the second board opinion in this case represents adequately and correctly the board's basic reason for its affirmance:

" * * * The question here presented is whether the composition claimed will, in fact, attain the purpose for which it is disclosed as useful. We consider Judge Holtzoff's decision in Isenstead v. Watson, [D.

---

9. Examiner's answer.

10. The examiner has pointed out in his answer that the 5 percent solutions of thiopental sodium "which were sometimes employed in the past" are not now used because "the buffering and diluting powers of the blood at the injection site were often insufficient to cope with the two-fold effect required in unit time, so a venous thrombosis frequently occurred."

However, the examiner also stated in his answer that these 5% solutions "do not have a substantially higher pH than the 2.5 percent solution." Thus, contrary to the suggestion of the solicitor, the fact that a 5 percent solution of thiopental sodium is more likely to cause vascular damage than a 2.5 percent solution is not evidence that solutions of pH 11.3 or 11.7 are more likely to cause vascular damage than solutions of pH 10 or 10.65.

C.] 157 F.Supp. 7, 115 U.S.P.Q. 408, to be applicable here. This decision states 'that the Patent Office should be very careful and perhaps even reluctant to grant a patent on a new medical formula until it has been thoroughly tested and successfully tried by more than one physician.' "

At this point we wish to point out that although the board, in affirming the examiner, referred to the necessity for proof that the "claimed composition is safe, effective and reliable," *neither the examiner nor the board has given any reasons for doubting the effectiveness and reliability of appellants' solutions in inducing anesthesia in any animal, including humans, and we will assume that upon a showing of safety in human therapy, the examiner and the board would have been satisfied as to all three qualities and would have conceded the compositions to be useful under section 101.*

Now we must consider two important questions. The examiner and the board have insisted upon "clear and convincing proof" that the claimed solutions, after appropriate dilution, are "safe" for injection into human veins. As we have already discussed supra, we agree with the examiner and the board that one skilled in this art would learn on reading appellants' specification that the claimed solutions are so to be used. What then is "safe" and what degree of "proof" is necessary in a case like this?

■ With regard to the first question, the nature of "safety" in the field of drugs and medicaments, we take judicial notice that many valued therapeutic substances or materials with desirable physiological properties, when administered to lower animals or humans, entail certain risks or may have undesirable side effects. True it is that such substance would be *more* useful if they were not

dangerous or did not have undesirable side effects, but the fact remains that they *are* useful, useful to doctors, veterinarians and research workers, useful to patients, both human and lower animal, and so are useful within the meaning of 35 U.S.C. § 101. The use of drugs in medicine is frequently a matter of balancing risks to save a life. "Safety" is a relative matter. An example relevant here is the obviously useful, commercially and medically acceptable material, solid thiopental sodium, used by Spruth as a control substance.[11] It appears that this material, although apparently widely used in human therapy, is *not* completely "safe" for that use. For example, as mentioned earlier in this opinion, the examiner himself has discussed the dangers inherent in the injection of 2.5 and 5 percent aqueous solutions of this material into human veins. Further, in the same regard, the "Merck Index," supra, warns:

> "Concentrated i. v. solns. (5% or more) may cause local thrombophlebitis. Intraarterial injection causes severe burning pain in periphery of extremity. Urticaria and skin rashes have been reported."

Also, the "Dispensatory of the United States," supra, states at page 1420:

> " * * * A 2.5 per cent, or less concentrated, solution of thiopental sodium is used for intravenous injection. A 5 per cent solution has been used but it is more dangerous and it may cause thrombosis of the vein because of its alkalinity * *."

Further, both of these references devote much space to a discussion of "Human Toxicity," "Toxicology" and "Contraindications."[12]

In view of these known dangers in using thiopental sodium in human ther-

---

11. See footnote 3 and excerpts from Spruth affidavit.

12. For example, the "Dispensatory" states under the heading, "Toxicology," in part as follows:

> "Respiratory depression is the most difficult problem in the use of this anesthetic agent. Oxygen for inhalation should be available and used (*v.s.*). The rapidity with which the patient passes through the several levels of anesthesia with thiopental sodium makes it difficult to recognize the presence of an excessive dose until apnea is present. If it is injected

apy, it might be expected that a solution such as that claimed by appellants which contains thiopental sodium [13] would be at least as dangerous to use for the same purpose. Therefore it would be completely unrealistic to insist that appellants' solutions be "safe" for use in human therapy. We do not know what criterion the Patent Office would have used had clinical studies relating to the use of appellants' solutions in human therapy been submitted, but we think the proper criterion is whether appellants' solutions are *as safe as* the previously and widely used and commercially acceptable solid form of pentothal sodium. It is this criterion which we have in mind in considering the second of our two questions, i. e., what degree of "proof" is necessary to demonstrate this degree of "safety."

The Patent Office has insisted on *clinical tests*, i. e. tests with human patients, to "prove" that appellants solutions are "safe" for human therapy. We do not know what sort of clinical tests would have satisfied the Patent Office, i. e. how many subjects of what age, sex, physical conditions, etc. and what degree of vascular damage, if any, would have been permissible in a "proof" of "safety," but it is unnecessary to concern ourselves with that matter because *no* clinical evidence whatever has been submitted. But that fact does not mean that there is no *evidence* of "safety" in the case at bar. On the basis of tests with rabbits, Spruth has stated in his affidavit:

> " * * * there are no significant differences between the safety * * of regular "Pentothal" powder, reconstituted, and any of the compositions of the specific examples of [the application at bar] * * *."

There are three important points involved in that statement. The qualifications of Spruth to express such an opinion have not been questioned (see footnote 2); the rabbit tests involve a side-by-side comparison of what appellants are claiming with a widely used, commercially and medically acceptable material; in our opinion, rabbits are "standard experimental animals" [14] for test-

---

in large single doses or too rapidly, respiratory arrest often results. While respiration is being restored, the brain rapidly becomes desaturated and a painful stimulus in the operative area often rouses the patient; the tendency is to administer another large dose of the drug which again stops respiration. This not only results in unsatisfactory anesthesia but the effect of painful stimuli on the inadequately anesthetized patient may result in laryngeal spasm or other untoward effects through stimulation of the autonomic nervous system. * * "
Under the heading, "Contraindications," the "Dispensatory" states in part:
"Thiopental sodium should not be used in the home or office as an anesthetic unless facilities for combating respiratory depression are readily available. It is not advocated for children under 10 years of age, * * * although Holly * * * found it useful in children if administered carefully. It is not advocated for operations on the upper respiratory tract, head or neck where respiratory obstruction may develop as a result of the operation. It is contraindicated in patients with dispnea or respiratory obstruction. Alone, it is inadequate for operations requiring complete muscular relaxation and it is not advised for procedures requiring more than 30 minutes. It is not used for extensive intrathoracic procedures. Thiopental sodium is not advisable in the presence of severe anemia. Caution is required in patients with severe hypotension or hypertension, myocardial disease, congestive heart failure, sepsis, severe obesity and all poor anesthetic risks. * * * "

13. Appealed claims 30–34 and 38 encompass "thiobarbituric acid" compounds generally, including thiopental sodium. Claim 39 is limited to thiopental sodium recited therein by its systematic name. See footnote 3.

14. We use the phrase "standard experimental animals" as we did in In re Krimmel, 292 F.2d 948, 48 CCPA 1116, where we defined it as "whatever animal is usually used by those skilled in the art to establish the particular pharmaceutical application in question." That case was decided after the briefs in the instant case had been filed but before the oral argument. Although it is not specifically stated in the record that rabbits are

ing the safety of thiobarbituric anesthetics.

Bearing in mind that *absolute proof* of such a proposition as "safety" of a drug or medicament is impossible and that "proof" of "safety" is relative with the degree of "proof" dependent on the quantity and quality of the available evidence, bearing in mind what evidence of "safety" has been submitted in the case at bar, and bearing in mind that inherent in the concept of the "standard experimental animal" is the ability of one skilled in the art to make the appropriate correlations between the results actually observed with the animal experiments and the probable results in human therapy, we hold that appellants' claimed solutions have been shown to be useful within the meaning of 35 U.S.C. § 101. In holding as we do, we realize that no *clinical* evidence has been submitted as to the "safety" of these solutions. Therefore there is lacking that degree of "proof" which such evidence would provide. However, we do not believe that such a degree of "proof" is necessary in view of the *factual situation* in the case at bar. We think that a sufficient *probability* of safety in human therapy has been demonstrated in the case at bar to satisfy the requirement of 35 U.S.C. § 101 that appellants' invention be useful.

Although the case at bar appears to be unlike any previously before this court, we find support for our position in many of the so-called reduction-to-practice cases decided by this court. Some of these are as follows: Harrison et al. v. Cadwell, 39 F.2d 704, 17 CCPA 1024; St. John et al. v. Schulze, 47 F.2d 798, 18 CCPA 1050; Payne v. Hurley, 71 F.2d 208, 21 CCPA 1144; Goodale v. Lund, 96 F.2d 840, 25 CCPA 1148; Chittick v. Lyons, 104 F.2d 818, 26 CCPA 1382; Taylor v. Swingle, 136 F.2d 914, 30 CCPA 1219; Lustig v. Legat, 154 F.2d 680, 33 CCPA 991; Morway et al. v. Bondi, 203 F.2d 742, 40 CCPA 917; Schnick v. Fenn, 277 F.2d 935, 47 CCPA 1174. Although the subject matter of those cases varies widely, in each, the requirements for an actual reduction to practice were at issue, and in each, use was made of certain laboratory experiments, laboratory-scale equipment, "shop tests," or "bench tests" in an attempt to establish reduction to practice. In some of the cases, the court found actual reduction to practice, had been established; in others, no actual reduction to practice was found. However, running through *all nine cases* cited is the same expressed or implied criterion, namely, how would one *skilled in the art* interpret the experiments or tests. If the court was convinced that *one skilled in the art* would accept a particular test or experiment as a "possibility" or "reasonable certainty" or "probability" or that it was "reasonably predictable" that a tested invention would operate as alleged or have the utility alleged, a reduction to practice was found; otherwise, the court found no reduction to practice.

Of course, the case at bar differs from the above cases in that the former involves merely an ex parte establishment of utility rather than proof of an actual reduction to practice in a priority dispute. Our citation of those cases should not be construed as a suggestion that the same standard of proof is applicable in both types of cases.

However, regardless of the issuance of the patent under the circumstances of the case at bar, there is no question but that the public must be protected absolutely against the advertising and sale and other distribution of harmful drugs, medicines and the like in all situations, including this one if such be the case. We believe that Congress has recognized this problem and has clearly expressed its intent to give statutory authority and responsibility in this area to Federal agencies different than that given to the Pat-

"standard experimental animals" for appellants' purpose, as defined in Krimmel, the Spruth affidavit indicates they are such and appellants made a statement to the same effect at oral argument. This statement was not rebutted by the solicitor.

ent Office. This is so because the standards established by statute for the advertisement, use, sale or distribution of drugs are quite different than the requirements under the Patent Act for the issuance of a patent. For example, the Federal Trade Commission has been given the responsibility of enforcing the Wheeler-Lea amendments to the Federal Trade Commission Act.[15] Also, the Food and Drug Administration has been given the responsibility of enforcing the Federal Food, Drug, and Cosmetic Act.[16]

We anticipate the argument that the Federal Trade Commission Act and the Federal Food, Drug, and Cosmetic Act do not protect the public against the advertising and sale or other distribution

15. See for example, 52 Stat. 114–117 (1938), as amended, 15 U.S.C. §§ 52–56 (1958). In particular, see 15 U.S.C. § 52 (a) which states:
   "§ 52. Dissemination of false advertisements—Unlawfulness
   "(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—
   "(1) By United States mails, or in commerce by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of foods, drugs, devices, or cosmetics; or
   "(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purpose in commerce of food, drugs, devices, or cosmetics."
   See also 15 U.S.C. § 54(a), which states in part:
   "§ 54. Same; penalties—Imposition of penalties
   "(a) Any person. partnership, or corporation who violates any provision of section 52(a) of this title shall, if the use of the commodity advertised may be injurious to health because of results from such use under the conditions prescribed in the advertisement thereof, or under such conditions as are customary or usual, * * * be guilty of a misdemeanor, * * *."

16. 52 Stat. 1040 (1938), as amended, 21 U.S.C. §§ 301–392 (1958). In particular, see 21 U.S.C. § 355, which states in part:
   "§ 355. New drugs—Necessity of effective application
   "(a) No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an application filed pursuant to subsection (b) of this section is effective with respect to such drug.
   "Filing application; contents
   "(b) Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a) of this section. Such person shall submit to the Secretary as a part of the application (1) full reports of investigations which have been made to show whether or not such drug is safe for use; (2) a full list of .the articles used as components of such drug; (3) a full statement of the composition of such drug; (4) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (5) such samples of such drug and of the articles used as components thereof as the Secretary may require; and (6) specimens of the labeling proposed to be used for such drug.
   *   *   *   *   *   *
   "Grounds for refusing application to become effective
   "(d) If the Secretary finds, after due notice to the applicant and giving him an opportunity for a hearing, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; or (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions, he shall, prior to the effective date of the application, issue an order refusing to permit the application to become effective. *   *   *"

of harmful drugs in intrastate commerce [17] and that, therefore, Congress must have intended that the Patent Office act in this limited area. We would not find this argument persuasive. First, we observe that any statutory authority given the Patent Office in this regard would have to stem from the provision of 35 U.S.C. § 101 that a patentable invention must be "useful." A comparison of this provision with the detailed provisions [18] of the Federal Trade Commission Act and the Federal Food, Drug, and Cosmetic Act indicates to us that if Congress had intended to use its constitutional authority under the patent clause [19] to do what it might not be able to do under the commerce clause,[20] it would have enacted drug patent legislation in detail corresponding to those two acts.

Second, it must be presumed that Congress is aware that almost all of the States have enacted legislation which gives to the public a degree of protection against the intrastate advertising and sale or other distribution of harmful drugs which, in many cases, approximates that protection given by the Federal Food, Drug, and Cosmetic Act.[21] There is not the slightest indication that Congress intended that the Patent Office, in the course of its examination of patent applications, close up any small hiatus left by the legislatures of those several States who do not protect their citizens against the intrastate advertising and sale or other distribution of harmful new drugs. As we said in In re Krimmel, supra:

"* * * It is not for us or the Patent Office to legislate and if the

17. We note in passing, however, the following suggestion of Earl W. Kintner in Federal Trade Commission Regulation of Food, Drug and Cosmetic Advertising, 1 Publishing, Entertainment, Advertising and Allied Fields L. Q., 8, 19 (1961):
"Under this section [15 U.S.C. § 52] the Commission has jurisdiction whenever it appears that false advertisements of these four classes of products are disseminated (1) by United States mails, (2) in commerce by any means or (3) *where there is a local dissemination of an advertisement* which is likely to induce, directly or indirectly, a purchase in commerce." [Emphasis ours.]

18. See footnotes 15 and 16.

19. U.S.Const. art. I, § 8, clause 8.

20. U.S.Const. art. I, § 8, clause 3.

21. Section 16 of the Uniform State Food, Drug and Cosmetic Bill, accepted and endorsed by the Executive Committee of the Association of Food and Drug Officials of the United States, October 1940, reads in part as follows:
"Section 16. (a) No person shall sell, deliver, offer for sale, hold for sale or give away any new drug unless (1) an application with respect thereto has become effective under Section 505 of the Federal Act [21 U.S.C. § 355; see footnote 18, supra.], or (2) when not subject to the Federal Act unless such drug has

been tested and has not been found to be unsafe for use under the conditions prescribed, recommended, or suggested in the labeling thereof, and prior to selling or offering for sale such drug, there has been filed with the ————* an application setting forth (a) full reports of investigations which have been made to show whether or not such drug is safe for use; (b) a full list of the articles used as components of such drug; (c) a full statement of the composition of such drug; (d) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (3) such samples of such drug and of the articles used as components thereof as the ————* may require; and (f) specimens of the labeling proposed to be used for such drug. * * *

"* Insert proper designation of State Officer, Board, Department, etc."
According to 3 CCH Food, Drug, Cosmetic L.Rep. (2d ed., 1959), with changes through May, 1962, this Section 16 or a provision substantially the same has been enacted into law by 25 of the 50 States. Moreover, this reference also indicates that most of the remaining States have enacted legislation providing varying degrees of protection against the advertising, labeling and sale of unsafe drugs.

Congress desires to give this responsibility to the Patent Office, it should do so by statute."

Therefore, in our judgment, the board has erred in rejecting the appealed claims. We have held that appellants disclose in their specification that their invention is useful in human therapy. The Patent Office has expressed doubt that the invention will be "safe" for that purpose. Although appellants have not supplied clinical data concerning the actual use of their invention in human therapy, they have supplied evidence and *expert opinion* based on laboratory experiments with rabbits, the "standard experimental animal" for their purpose, that their invention is as safe as a widely used, commercially and medically acceptable material. In our opinion, this evidence indicates a sufficient *probability* that the invention will be as safe as this latter material in human therapy to satisfy the statutory requirement that the invention be useful.

■ Although it is true that the advertising and sale or other distribution of appellants' invention for human therapy in interstate and much of the intrastate commerce will not be legally permissible until experiments with humans have been carried out, we do not think it is within the authority or responsibility of the Patent Office to demand such tests *in this particular case* in view of the evidence of record. However, no implication is intended here that clinical evidence should not be demanded by the Patent Office under different circumstances. Each case must be decided on its own set of facts.

For the foregoing reasons, we *reverse* the decision of the Board of Appeals.

Reversed.

SMITH, Judge (concurring).

The majority opinion herein has, I believe, performed a public service in pointing out what Congress has established as the respective functions of the Patent Office, the Federal Trade Commission, and the Food and Drug Administration, in dealing with new pharmaceutical preparations. I agree with the result reached in the majority opinion but have been influenced by some additional considerations which are the subject of this concurring opinion.

The position of the Patent Office in the present case is stated as follows by the solicitor in his brief:

"Faced with evidence to show that the alkalinity of a 5 percent solution is "more dangerous" and may cause "thrombosis of the vein", and faced with the fact that the claimed composition actually showed upon dilution a pH up to 11.7 * * *, it is submitted that *the tribunals of the Patent Office were carrying out their statutory duty, when they required proof of safety and effectiveness in man* * * *, and that such requirement was not unreasonable in the light of the facts and circumstances of this case." [Emphasis added.]

In my opinion, the condition to the grant of patents in the pharmaceutical field which the Patent Office here seeks to impose on appellants is not supported by any provisions I have been able to find in the patent statute.

35 U.S.C. §§ 101, 102 and 103 make no distinction between classes of inventions as to the "conditions of patentability" and section 102 opens with the statement "A person shall be entitled to a patent unless—" and then lists specific statutory grounds on which a patent may be refused. "Safety and effectiveness in man" is not one of these conditions. In enacting the patent statute, I am certain it was recognized by Congress that many inventions have in them an element of danger to man and of necessity must proceed upon an underlying assumption that despite such possible dangers, we must judge patentability of the inventions on the basis of their use by those who are intelligent enough to understand such dangers as may be present and who are sufficiently

skilled to use the inventions for their intended purposes.[1]

To have complied with the requirements of the Patent Office in the present case, based on its assumption of some vaguely asserted "statutory duty" imposed on the Patent Office, would have meant an extensive delay before proofs of "safety and effectiveness in man" acceptable to the examiner could have been secured. This delay would have started with securing permission from the Food and Drug Administration to so test the composition. Even after this permission is granted and the tests of the new therapeutic composition are made on humans, it is a well-known fact, of which we can properly take judicial notice, that even such tests are not necessarily conclusive. Thus, to conduct tests which would conclusively establish the "safety and effectiveness" of the pharmaceutical preparation here involved could well mean the delay of many years before the present application could be allowed and the patent issued.[2] The primary public duty which the Patent Office is charged with performing under 35 U.S.C. §§ 101, 102 and 103, is to *issue* patents on applications which meet the statutory require-

ments. This duty should not be so exercised, as it seems to me that it was here, to defeat one of the important public purposes of the patent laws, i. e., the prompt publication of inventions.

Robinson in his "Treatise on the Law of Patents" (1890), refers in section 32 to "the duty which the state owes to the people to obtain for them, at the earliest moment, the practical use of every valuable invention in the industrial arts" and in securing "publication of the invention as soon as it is brought to such perfection as to be capable of practical employment."

The proper test to be here applied, it seems to me, is not the ultimate "safety and effectiveness in man," as contended by the Patent Office, but is the test, as suggested by Robinson, whether "the invention has been brought to such perfection as to be capable of practical employment." If this test is applied to the proof here presented, it seems to me appellants have clearly shown that their invention had been brought to such perfection that it was capable of practical employment.

The "statutory duty" to which the solicitor refers, seems also to underlie the

1. The dissenting opinion herein contains the statement:
    " * * * The record contains ample evidence that the highly caustic nature of this drug, used as a hypnotic and to induce surgical anesthesia, makes it dangerous when injected in human beings. * * * "
    Despite careful consideration of the record herein, I am unable to find what I am willing to consider as "ample evidence" on this matter. The examiner's position seems to be that since the cited literature discloses that venous damage at the injection site is likely when highly alkaline solutions are injected, the present composition, because of its alkalinity, will cause such damage and thus is not a "safe" preparation. It seems to me that this position was amply rebutted by the affidavits filed by appellants. The issue thus met, it seems to me, is the issue of whether or not venous damage is caused by the use of the claimed invention for its intended purpose. Standard tests on laboratory animals showing that no such damage occurred seems to me to

be an ample showing of safety of the composition when used by persons skilled and competent in this field.

2. While the public interest demands that all applications for patents be thoroughly and carefully examined by the proper Patent Office personnel, the public interest also demands a reduction in the time lag between the filing of a patent application and final action. Cf. Report ordered printed May 9, 1962, of the Committee of the Judiciary, United States Senate, made by its Subcommittee on Patents, Trademarks and Copyrights pursuant to S.Res. 55, 87th Congress, First Session, as extended pp. 12–13. A greater consideration for the reasonableness of the proofs required in a case such as the present would, it seems to me, be one way in which the noted time lag could be reduced in such cases. I note in passing that the application now before us was filed over eight years ago, and the parent application on which it was based was filed over nine and one-half years ago.

opinion of the Board of Appeals on reconsideration where it is stated:

"* * * The question here presented is whether the composition claimed will, in fact, attain the purpose for which it is disclosed as useful. We consider Judge Holtzoff's decision in Isenstead v. Watson, [D. C.] 157 F.Supp. 7, 115 USPQ 408, to be applicable here. This decision states 'that the Patent Office should be very careful and perhaps even reluctant to grant a patent on a new medical formula until it has been thoroughly tested and successfully tried by more than one physician.' We need not, though, determine the extent of the clinical testing necessary because the appeal does not present this problem."

The admonition contained in the dictum of the court in Isenstead v. Watson, D.C., 157 F.Supp. 7, thus seems to have become, by Patent Office fiat, a "statutory duty," which extends even to a determination of the proper "extent of clinical testing."

Since these "statutory duties" appear to have their origins in Isenstead v. Watson, supra, a brief review of this decision is desirable. There are few facts stated in the opinion since the proceeding was "in camera." Nothing is revealed as to the subject matter of the invention in issue other than that it related "to a medical compound for the purpose of testing the function of the human liver" and that rejected claim 2 covered "a composition of matter adapted to shift blood proteins, consisting of three different substances." In the opinion, after a reference to 35 U.S.C. § 101, Judge Holtzoff relates the statutory word "useful" to the concept of "utility" and says:

"* * * 'Utility' is a broad term and implies among other things capacity to perform the function or to attain the result claimed by the applicant in his disclosure. For example, in the case of Besser v. Merrilat Culvert Core Co., 243 F. 611, 612, [156 C.C.A. 309,] decided by the Eighth Circuit, it was held that:

"'The term "useful," as contained in the patent law, when applied to a machine, means that the machine will accomplish the purpose practically when applied in industry.' "

"This Court is of the opinion that the same test of utility sould be applied to a composition of matter. In other words, will the invention attain the purpose and will it operate as disclosed and claimed by the inventor?"

Judge Holtzoff's test of utility therefore seems to have been: "Will the invention attain the purpose and will it operate as disclosed and claimed by the inventor"? However in the present instance the examiner, the board, and the solicitor seem to me to have departed from this test in favor of the "statutory duty" which they derive from the dictum:

"Great care and scrutiny should be particularly taken in connection with applications for medical patents. While the granting of a patent does not legally constitute a certificate that the medicine to which it relates is a good medicine and will cure the disease or successfully make the test which it was intended to do, nevertheless, the granting of such a patent gives a kind of official imprimatur to the medicine in question on which as a moral matter some members of the public are likely to rely. In view of these circumstances, it is right and proper that the Patent Office should be very careful and perhaps even reluctant to grant a patent on a new medical formula until it has been thoroughly tested and successfully tried by more than one physician. It seems to the Court that therefore the Patent Office, as a matter of public policy, followed a proper course in this matter." (157 F.Supp. at p. 9).

In a more recent decision, Commonwealth Engineering Company of Ohio et

al. v. Ladd, D.C., 199 F.Supp. 51 (1961), Judge Holtzoff referred to his prior decision in Isenstead v. Watson, supra, and stated that his remarks, which I have previously characterized as "dictum," "are equally applicable to a process intended for medical use."

I agree with Judge Holtzoff's decision in the Commonwealth Engineering case insofar as it upholds the right of the Patent Office to require proof that the disclosed invention is "useful," but I think the recurrence of the dictum of the Isenstead case is unfortunate in that as here used it is stated out of context and without the benefit of Judge Holtzoff's other cogent observations in the Isenstead case.

The recurrent theme of the dictum in the Isenstead case and its repetition in the Commonwealth Engineering case suggests that the Patent Office should assume an obligation as to the public safety which here finds expression in its requirement that applicant must supply proof of "safety and effectiveness" of the claimed composition "in man." This concept will not stand analysis.

The dissenting opinion goes beyond the record here and refers to "the now infamous drug thalidomide." While I can see no pertinence of this material to any issue here presented, I observe that here is dramatic proof, if any be needed, that the issuance of a patent is not in fact an "imprimatur" as to the safety and effectiveness of any pharmaceutical product for any purpose.

It is an elemental principle of patent law that a patent grants no more than the legal right to exclude others from making, using or selling the thing patented. It is no guarantee of anything and gives no one a right to make, use or sell anything. The public, therefore, is in no way protected either by the granting or withholding of a patent.

However, so that the reference to thalidomide in the dissenting opinion will be complete, it is here noted that thalidomide is the subject matter of U. S. Patent #2,830,991 which issued April 15, 1958. Despite the issuance of this patent, and

the "imprimatur" which the dissenting judges would find in such issuance, the Federal Food and Drug Administration, in the exercise of its statutory authority, withheld its approval of the drug.

As previously pointed out, one major public purpose of the patent law is to secure the disclosure of inventions with the least possible delay. In discharging this function, it is entirely proper that reasonable proof of an applicant's asserted utility be required by the Patent Office. What I here criticize is the manner in which these requirements have been extended beyond a reasonable compliance with statutory requirements. I find no reason, either in logic, justice, or public policy why the grant of a patent here should be delayed until the pharmacological merits of the disclosed invention are established by clinical tests conducted on humans, when such merits may be evaluated on the basis of other qualified tests.

WORLEY, Chief Judge, dissenting, with whom JACKSON, Judge, joins.

The examiner, the members of the board, and the majority here all agree that the instant composition is to be used as a drug on human beings. Despite that fact the majority holds that the Patent Office has no "authority or responsibility" to require clinical evidence that, when applicants' drug is used on human beings, there is "freedom from vascular damage at the site of injection."

Inasmuch as Congress has clearly charged the Patent Office with determining the patentability of inventions, and since the information requested relates to the usefulness of the drug on human beings, it would be far more accurate to hold that it is this court which has no "authority or responsibility" to strip the Patent Office of that statutory duty.

It is the Patent Office, no other agency, which Congress has always held responsible for determining patentability of inventions. That Congress intends the Patent Office to continue in that role is made crystal clear in the following ex-

cerpt from the remarks of Senator Eastland in presenting S. 1552:[1]

"* * * The final decision as to patentability would be left to the Commissioner of Patents, as has been the practice in the past." (Italics supplied.)

Under such circumstances it is impossible for me to reconcile the majority position with what I am convinced is a clear Congressional expression.

The majority concedes that "the case at bar appears to be unlike any previously before this court." I agree, but regret that the majority finds it necessary to go so far beyond the record and the reasons of appeal[2] in a fruitless search of support for its unprecedented holding.

For example, it seems to find some degree of comfort in nine interference cases, none cited or relied on below, or mentioned when this appeal was argued here. Those cases, involving subject matter ranging from spark plugs to zipper fasteners, are completely foreign to the subject matter, facts, and issues here. In those cases the court was dealing exclusively with the sufficiency of evidence offered by contesting parties regarding reduction to practice and priority of invention. Those decisions could not possibly have anticipated the problems here. To hold, therefore, that they have any relevance whatever to the case at bar is, I respectfully suggest, logically and legally insupportable.

But a decision which was cited and relied on by the board, but not discussed by the majority, is Isenstead v. Watson, D.C., 157 F.Supp. 7. There Isenstead sought patent protection on "a medicinal compound for the purpose of testing the function of the human liver." The examiner held that proof of utility for that purpose was inadequate and insufficient. The board affirmed. The District Court upheld the Patent Office, stating:

"* * * This Court in a technical matter such as this should not lightly set aside the decision of the Patent Office. Moreover, an independent examination by the Court of the affidavits submitted as proof of utility leads the Court to concur in the view of the Patent Office that the number of cases tested and the results obtained are not sufficient to justify an affirmative finding of utility. It must be borne in mind in this connection that the burden is on the applicant for a patent to prove that he is entitled to it, and therefore the onus is on him to show that the invention will operate as disclosed in the application and will achieve its objective." (Italics supplied.)

Presumably Isenstead did not disagree with that interpretation of the law since he took no appeal. Moreover, Congress has not only taken no steps to change the law, but has reaffirmed the authority of the Patent Office.[3] Indeed, applicants here do not question the soundness of that decision, or challenge the authority of the Patent Office to make such a requirement, but attempt only to distinguish it from the instant facts.

---

1. Congressional Record, August 23, 1962, page 16303. S.1552, is now Sec. 308 of the Drug Amendments of 1962 which amends Sec. 702 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 372) by adding at the end thereof the following new subsection:

"(d) The Secretary is authorized and directed, upon request from the Commissioner of Patents, to furnish full and complete information with respect to such questions relating to drugs as the Commissioner may submit concerning any patent application. The Secretary is further authorized, upon receipt of any such request, to conduct or cause to be conducted, such research as may be required."

2. 35 U.S.C. § 144 states in part:
"The United States Court of Customs and Patent Appeals, on petition, shall hear and determine such appeal on the evidence produced before the Patent Office, and the decision shall be confined to the points set forth in the reasons of appeal. * * *" (Italics supplied.)

3. See footnote 1, supra.

Here, as in Isenstead, the drug is to be used on human beings. It must be remembered that applicants' drug composition is even more caustic than its prior art counter part.[4] Under such circumstances the requirement of the examiner was anything but capricious, unreasonable or arbitrary. He not only had the authority, but a clear responsibility to require the instant clinical evidence. The record contains ample evidence that the highly caustic nature of this drug, used as a hypnotic and to induce surgical anesthesia, makes it dangerous when injected in human beings. Although applicants did not rebut the examiner's position, the majority characterizes the evidence as "merely an opinion by the examiner." Certainly there is no support in this record for the conclusion that one skilled in this art could inject applicants' drug into the human body *without* causing vascular damage. Surely, that obligation must rest on applicants, not on the Patent Office.

The weakest and the most dangerous element in the majority rationale is its apparent adoption of the theory, which is *sheer speculation*, nothing more, that if a given drug will have a certain effect on "a standard experimental animal," whatever that animal might be, it will "probably" have the same effect on human beings. Not even the applicants have the temerity to argue such a scientifically unsound proposition. That reasoning is a dangerously blind and unnecessary excursion into a field in which this court is not competent to venture on its own.

4. The affidavit of Cox submitted by applicants shows that a 2½% solution of the prior art material has a pH of 10.65, while a 2½% solution of the claimed drug composition has a higher alkalinity, it being at a pH of 11.3 to 11.7.

5. It appears to be a matter of general knowledge that thalidomide, although effective as a sedative in human beings, resulted in deformed offspring born to women who had taken it during pregnancy. It had *neither* of those effects when given to *experimental animals* in normal experimental doses. Thalidomide was patented in the United States on April 15,

Surely there can be no valid reason to hold, as a matter of law, that a drug used on mice or rabbits, as here, will *probably* have the same effect on the complex system of the human body. The fallacy of that reasoning, if an example is even remotely needed, is illustrated by the recent tragic experiences with the now infamous drug thalidomide.[5]

I see no relevance in the acts dealing with the Federal Trade Commission or the Food and Drug Administration, neither of which was cited below nor when this appeal was argued. If those acts are cited for the purpose of showing that Congress intended agencies other than the Patent Office to *police* the sale and distribution of drugs and cosmetics, then I am in complete agreement. If, however, they are cited to prove that Congress intended the Patent Office to be *restricted* or *relieved* of its duties regarding the *patentability* of inventions, I am in complete disagreement. That is much like saying that the Patent Office should be relieved of its duties to determine the patentability of machine guns, for example, merely because Congress might charge another agency with *policing* their sale and distribution.

That Congress has, as a practical matter, recognized the desirability of *cooperation* between the Patent Office and other agencies is evident from the following: [6]

"* * * The final decision as to patentability would be left to the Commissioner of Patents, as has been the practice in the past. *With such help from the Department of*

1958 in U. S. Patent No. 2,830,991. It is assigned to Chemie Grünenthal G.M. B.H., Stolberg, Rhineland, Germany. The patent claims priority based on a German application filed May 17, 1954.

Only recently, in In re Fisher, CCPA, 307 F.2d 948, this court found as a fact: "Thus it appears that the prior art ACTH concentrates *are useful for injection into* 'rats, guinea pigs, and similar *animals*' but * * * in 'most cases *cannot be tolerated by the human being.*'" (Italics supplied.)

6. Congressional Record, August 23, 1962, page 16303.

*Health, Education, and Welfare, the Commissioner of Patents will be better equipped to make the decision as to whether a new drug represents the kind of genuine technical advance and new-product competition that should continue to be stimulated by patent rights."* (Italics supplied.)

Surely there can be no question that Congress intends the Patent Office to *continue* its responsibility of determining the patentability of all inventions, *including drugs for use on human beings.*

In denying that function to the Patent Office a rather odd result is reached: although applicants strenuously argue that their specification makes no mention of human beings; although they stress that the usefulness of their drug has been established *only* by tests on mice and rabbits; although they insist they have made *no tests whatever on human beings,* and *make no predictions whether their drug will be safe or unsafe when used on human beings;* nevertheless, the majority holds that applicants' drug is "probably" safe for use on human beings and applicants are, therefore, entitled to unlimited patent protection. I am aware of no parallel in patent litigation, and cannot believe that Congress intended an applicant to receive a seventeen-year monopoly under such circumstances.

To my knowledge this is the first time the authority of the Patent Office to require clinical evidence relating to the "usefulness" of a drug to be used on human beings has been challenged; *indeed, applicants do not challenge it here.* That authority has been continuously exercised by the Patent Office with the full approval of the Congress. There can be no valid reason in law or logic to interfere with that practice.

I regret to say that if the majority opinion remains the law of the land, as it must unless the Supreme Court or the Congress sets us straight, I can see nothing but uncertainty and trouble ahead for the Patent Office, the patent system as we have always known it, and the public.