384 F.2d 429
 EASTERN ROTORCRAFT CORPORATION
v.
The UNITED STATES
v.
Sidney G. SANDNES, Edward S. Sandnes, and Arnold G. Sandnes, a partnership, d.b.a. Sandnes' Sons, Third-Party Defendants.
 No. 14-63.
 United States Court of Claims.
 October 13, 1967.
 
 Andrew R. Klein, Philadelphia, Pa., attorney of record, for plaintiff.
 David E. Evrard, Washington, D. C., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.
 Thomas J. Macpeak, Washington, D. C., for third-party defendants, Irving M. Tullar, Harris C. Lockwood, and Beale & Jones, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 DURFEE, Judge.*
 
 
 1
 The Eastern Rotorcraft Corporation, a Pennsylvania corporation owning the patent involved in this litigation, sues, under 28 U.S.C. § 1498, to recover the "reasonable and entire compensation" for the Government's allegedly unauthorized use of its patented invention. Only the question of liability is now before the court.
 
 
 2
 The patent in suit is the Campbell Patent No. 2,705,461 entitled "Cargo Net Fabricated From Flexible Cable." It discloses a cargo net that, when spread out, extends in a zigzag fashion and produces diamond-shaped parallelogram meshes throughout the body of the net. Ring or hook fittings are attached along the sides and ends of the nets and at the exterior corners of the peripheral parallelograms. A net made in this manner has a high degree of flexibility and is readily adaptable to retain different shaped cargo. When not in use, the net may be collapsed by stretching it horizontally and returning the zigzag runs of cable to a parallel relationship and it may be rolled into a bundle for easy storage.
 
 
 3
 * In December 1950, plaintiff entered into a contract with the Department of the Air Force for the production of six airplane cargo nets. The contract stipulated that plaintiff would grant the Government a non-exclusive, royalty-free license to any invention that was "first reduced to practice" either during the performance of the contract or "upon the understanding that a contract would be awarded."[1] Since the invention was not reduced to practice "upon the understanding that a contract would be awarded," the Government is only entitled to a license if the reduction to practice was not completed prior to the contract.
 
 
 4
 Reduction to practice occurs when the workability of an invention can be demonstrated. Workability means that a physical form of the invention has been constructed which functions. Nash and Lasken, "Patent Rights Under Government Contracts" in Patents and Technical Data (Gov't Contracts Monograph #10) 42-52. And this requires testing the invention. The amount of testing necessary is based upon the needs of the particular art. Sinko Tool and Mfg. Co. v. Automatic Devices Corp., 157 F.2d 974 (2d Cir. 1946). Some devices are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate their workability. Mason v. Hepburn, 13 App.D.C. 86 (1898); Buchanan v. Lademann, 54 F.2d 425, 19 CCPA 836 (1932). Other devices required laboratory testing; others, service testing in their intended environment. E. g., Elmore v. Schmitt, 278 F.2d 510, 41 CCPA 958 (CCPA 1960); Paivinen v. Sands, 339 F.2d 217, 52 CCPA 906 (1964). In all these situations, the inquiry is not what kind of test was conducted, but whether the test conducted showed that the invention would work as intended in its contemplated use. Elmore v. Schmitt, supra; Gaiser v. Linder, 253 F.2d 433, 45 CCPA 846 (1958). Proof of the invention's utility for its intended purpose does not require proof of its flawlessness; it is only necessary to show that the invention is able to perform its intended purpose beyond a probability of failure. Taylor v. Swingle, 136 F.2d 914, 30 CCPA 1219 (1943).
 
 
 5
 In November, 1949, the inventor, during a conference at Wright-Patterson AFB on cargo tie-down equipment for airplanes, was informed that the Air Force, having experienced difficulty holding down miscellaneous loads inside airplanes during the Berlin airlift, was considering the use of a new type of cargo net. The nets under consideration used square mesh cable nets made from transversely intersecting cable members. They did not have the flexibility to adapt to mixed loads. Nor could they be collapsed and stored in a bundle. Soon thereafter the inventor thought of the net which is now the patent in suit. He requisitioned the necessary components and constructed a sample net. On April 16, 1950, he successfully placed the net over a load of miscellaneous items placed on a pallet. After seeing that the net adapted to the contour of the items, he removed the net, collapsed it, and placed it rolled up inside his briefcase. The following week he took the cable net to interested Air Force personnel at Wright-Patterson AFB. Application for a patent was not filed until June 19, 1951.
 
 
 6
 The cargo net patent has two primary purposes. One is to provide flexible nets that can cover and hold a large number of varied objects during transit. Campbell Specification at col. 1, ls. 15-18. The other is "to provide a net construction which may be readily folded for storage purposes" so that it "may be conveniently stored in a rack or rolled into a compact coil." Id. at col. 1, ls. 35-40. The tests performed by the inventor on April 16, 1950, sufficiently demonstrated the workability of the net for the purposes stated in the patent specification. The invention was thus reduced to practice prior to the Government contract; therefore, the Government does not have a license to the patent.
 
 
 7
 Several months after the inventor gave the Air Force the sample nets, plaintiff was awarded a contract for six cable nets. During the performance of the contract, the inventor improved the structural pattern of the nets so that they could be more easily manufactured. Plaintiff filed a patent application for the improved structure and in January, 1952, granted an express license to the Government on the improved invention.
 
 
 8
 Defendant contends that this express license gives it an implied license to the original patent in suit. Since the patent in suit is the dominant patent, it claims that its license is without value unless it has an implied license. Factually, this contention is not true because when the patent in suit expires, defendant will be able to freely make nets using both patents. And contractually, it is not sound inasmuch as the contract states that the Government will not obtain a license either "directly or by implication" to inventions made outside the contract.
 
 II
 
 9
 Defendant and third-party defendants contend that the patent is not valid because "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. In support of its defense of obviousness, defendant first presented sixteen prior art patents. During the trial, it relied principally upon the Clark Patent No. 926,242 in view of either the Swift Patent No. 631,910, the Elia Patent No. 1,772,888, or the Brickman Patent No. 2,462,432 and the Netherlands Patent No. 32,401 in view of the Lee Patent No. 1,365,511. After the trial, defendant shifted its reliance to the Swift Patent No. 631,910 in view of the Henry Patent No. 830,320. Upon briefs and oral argument to the court, defendant shifted back to the Brickman Patent No. 2,462,432. The third-party defendants also chose at this time to rely on the Brickman Patent.[2] In determining the obviousness of the patent in suit, only the Brickman patent will be considered.
 
 
 10
 In Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the Supreme Court set forth the guidelines to follow in determining the obviousness of a patent under 35 U.S.C. § 103:
 
 
 11
 * * * the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. * * *
 
 
 12
 The Brickman patent provides a "method for securing fittings to wire structures." Its sole concern is with a method; it makes no references to any potential use for the wire structures after the fittings have been attached. See Brickman Specification at col. 1, Is. 1-28. The patent in suit provides a cable cargo net that is more flexible and compact than earlier nets. See Campbell Specification, supra. It achieves its purposes by fastening load attachment terminals to the cable runs at the external corners of the peripheral parallelograms. The Brickman patent differs from the patent in suit in that it makes no reference to (1) the location of attachment terminals[3] and (2) the fact that the net can be rolled into a compact bundle.[4]
 
 
 13
 The level of skill in this pertinent art did not make these two teachings of the patent in suit obvious. The problems of terminal attachment and net storage were not easily solved. Often terminals were only placed at the corners of the net. This approach lessened the net's adaptability to cargo of different sizes. Compact storage of the net was usually not possible because of border cables circumscribing the net. If the patent in suit made non-obvious advances over earlier cargo nets, it follows that its differences with a method for making wire mesh are also non-obvious. Therefore, the patent in suit is valid.
 
 III
 
 14
 As stated in Autogiro Company of America v. United States, Ct.Cl., 384 F. 2d 391, decided today:
 
 
 15
 * * * the determination of patent infringement is a two-step process. First, the meaning of the claims in issue must be determined by a study of all relevant patent documents. Secondly, the claims must be read on the accused structures. In doing this, it is of little value that they read literally on the structures. What is crucial is that the structures must do the same work, in substantially the same way, and accomplish substantially the same result to constitute infringement. * * *
 
 
 16
 The claims of the patent in suit[5] are not restricted to a net structure in which each cable run is made from a separate cable. They can be read to cover a net structure formed by a plurality of runs of cable in which a single cable is doubled back to form two of the cable runs. This interpretation of the claims finds support in both the patent drawings and the specification. Figure 4 of the patent depicts a cable that is doubled back to form two runs. The specification states at col. 1, ls. 19-22:
 
 
 17
 In constructing nets for use in retaining or handling cargo, it is the normal practice to provide members which run longitudinally and transversely with respect to the edges of the net proper.
 
 
 18
 In the accused structure, the interior runs of cable are formed by folding the cable in half so that one cable forms two runs. The terminal attachments are fastened at the exterior corner of each peripheral parallelogram. Since the function and mode of operation of the accused structure is the same as that claimed in the patent in suit, there is infringement by defendant.
 
 IV
 
 19
 In summary, we find: (1) defendant and third-party defendants do not have a license to the patent, (2) the patent is valid, and (3) it has been infringed by structures made for defendant. Plaintiff is entitled to recover for the unauthorized use by defendant of its patent and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c) (2).
 
 
 Campbell Patent No. 2,705,461 — The Patent in Suit
 
 
 20
 1. A net device constructed from flexible cable including a plurality of generally longitudinal runs of cable, each run extending in zig-zag fashion when the net mesh is in open position, each interior run being attached to the adjacent run on one side at spaced points by a swaged fitting at each point and being similarly attached to the adjacent run on the other side at alternately spaced points to form a series of parallelograms with their sides lying in diagonal relationship with respect to the longitudinal direction, said swaged fittings having their longitudinal axes lying in the longitudinal direction of the cable runs, a plurality of load attachment terminals located at the ends of inside cable runs, each of said terminals being connected to the ends of two runs of cable at the external corner of a peripheral parallelogram.
 
 
 21
 2. A net construction according to claim 1 wherein each load attachment terminal has a looped portion of cable formed by a swaged fitting.
 
 
 22
 3. A net device constructed from flexible cable including a plurality of generally longitudinal runs of cable, each run extending in zig-zag fashion when the net mesh is in open position, each interior run being attached to the adjacent run on one side at spaced points by a swaged fitting at each point and being similarly attached to the adjacent run on the other side at alternately spaced points to form a series of parallelograms with their sides lying in diagonal relationship with respect to the longitudinal direction of the net device, said swaged fittings having their longitudinal axes lying in the longitudinal direction of the cable runs, a plurality of load attachment terminals each located at the ends of two inside cable runs, each of said terminals being connected at the external corner of a peripheral parallelogram, the sides of the net also being provided with a plurality of load attachment terminals, each located at an external corner of a peripheral parallelogram.
 
 
 23
 4. A new device constructed from flexible cable including a plurality of generally longitudinal runs of cable, each run extending in zig-zag fashion when the net mesh is in open position, each interior run being attached to the adjacent run on one side at spaced points by a swaged fitting at each point and being similarly attached to the adjacent run on the other side at alternately spaced points to form a series of parallelograms with their sides lying in diagonal relationship with respect to the longitudinal direction of the net device, said swaged fittings having their longitudinal axes lying in the longitudinal direction of the cable runs, a plurality of load attachment terminals located along the side of the net, each located at an external corner of a peripheral parallelogram and each having a loop portion of cable formed by a swaged fitting whose longitudinal axis lies in a transverse direction with respect to the swaged fittings which form the corner points of the inside parallelogram.
 
 
 
 Notes:
 
 
 *
 At the direction of the court, Trial Commissioner Donald E. Lane prepared an opinion which has been of substantial assistance
 
 
 [1]
 The contract read:
 "The contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, non-transferable and royalty-free license to practice, and cause to be practiced for the Government throughout the world * * * any Subject Invention conceived prior to any performance of this contract as set forth in paragraph (a) above but first actually reduced to practice in the course of any such performance * * *."
 Subject Invention is defined as: "any invention, improvement or discovery (whether or not patentable) conceived or first actually reduced to practice either (A) in the performance of the experimental developmental or research work called for under this contract, or (B) in the performance of any experimental, developmental or research work relating to the subject matter of this contract which was done upon the understanding that a contract would be awarded."
 
 
 [2]
 The third-party defendants made no appearances at the trial and filed no requests for findings. They only took an active part in the defense of this suit after the issuance of the commissioner's report. Prior to their briefs and oral argument before the court, they presented no prior art references to support the obviousness defense
 
 
 [3]
 The loop in figure 5 of the Brickman patent is neither referred to as an attachment terminal nor is a location for it described. In fact, no mention is made of any relationship between the loop and a net. It is only shown as a way to secure fittings to wire loops
 
 
 [4]
 Figure 2 of the Brickman patent does not show the capacity of the net to be easily rolled up; instead, it shows the initial step in making wire mesh according to the patent. See Brickman Specification at col. 1, ls. 33-34
 
 
 [5]
 The claims are in the appendix